# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH GOEBEL, *et. al.,* | ) | CASE NO.  5:07 CV 0027 |
| | ) | |
| | ) | |
| Plaintiffs, | ) | JUDGE PETER C. ECONOMUS |
| | ) | |
| v. | ) | |
| | ) | |
| TASER INTERNATIONAL, INC., | ) | MEMORANDUM OPINION |
| *et. al.,* | ) | AND ORDER |
| | ) | |
| Defendants. | ) | |

This matter is before the Court upon Defendant Police Officers John Ross ("Ross"),

Vince Yurick ("Yurick"), and Robert Horvath's ("Horvath") ("Defendants") Motion for

Summary Judgment.  (Dkt. # 19).

## I.   FACTUAL BACKGROUND

Plaintiffs Kenneth Goebel, as Administrator of the Estate of Dennis Hyde, Jr.

("Hyde"), and Joan Brown, mother of the deceased, bring this action for money damages

against officers Ross, Yurick, and Horvath.[1]

City of Akron Officers John Ross ("Ross") and Anthony Kelly ("Kelly") responded

---

[1]

Although the Complaint initially named Anthony Kelly, Paul Achberger, Daniel Murphy,
Robert Jackson, Bill Congrove, and the City of Akron, Plaintiff dismissed those
Defendants on May 29, 2007.  In addition, Plaintiff dismissed claims against Taser
International, Inc., City of Akron Police Department, and Michael Matulavich on April 13,
2007.  (Dkt. #13).  Therefore, the only three Defendants left are Ross, Yurick, and
Horvath.

to a burglary in progress call at 965 Triplett Boulevard at approximately 6 a.m. on January 5, 2005.  (Dkt. # 24).  Upon arrival, Ross observed the house with the front porch light on and a broken front window, with a trail of blood along the front of the house and broken windows across the porch. (Exh. A, Ross Depo, pp. 8-10); (Exh. F, Fox Aff.; See photo #1 to 3 of front porch).  At this point, Kelly and Ross split up, with Kelly taking the back perimeter of the house.  Ross called for back-up and shortly thereafter Paul Achberger ("Achbergher")  arrived on the scene. (Exh. A, Ross Depo, p. 10).  The owner of the home then let the police inside the residence and exited the house.  (Exh. G, Prebonick Aff., 911 tape, Item #1; Exh. I, Hazen Aff; Item #1, Transcript of 911 tape).

When the officers entered the house, all the lights in the house went out and the officers used their flashlights to follow the trail of blood.  (Dkt. #s 19-1, Ross Depo.; 19-6, Fox Aff.).  Ross observed a utensil drawer open in the kitchen and knives were scattered on the floor.  Ross then noticed a door in the kitchen leading to the basement and opened it.  The officers entered the basement and announced their presence, but received no response. (Exh. A, Ross Depo, p. 12).

Ross then noticed Hyde behind the furnace.  Ross identified himself as an Akron Police Officer and repeatedly ordered Hyde to come out and show his hands.  Hyde, however, did not comply with Ross's orders and remained behind the furnace.  (Dkt. # 19-1, Ross Depo.).  At this time, officers Robert Horvath ("Horvath") and Vince Yurick ("Yurick") heard the dispatch over their radio and arrived on the scene.  Horvath, observing blood on the porch of the residence, called the City of Akron Emergency Medical Services ("EMS").

Horvath and Yurick then entered the residence, and proceeded to the basement where they could hear Ross yelling.  Officers Daniel Murphy ("Murhpy") and Robert Jackson ("Jackson") also entered the residence around this time, and entered the basement to assist the other officers.

The officers claim Hyde began ranting that he was the devil, he had a gun, and all the officers were going to die and go to hell.  (Dkt. # 19-1, Ross Depo.).  Ross recognized that Hyde did not have a gun in his hands, and informed the other officers.  (Dkt. # 19).  Hyde took up a glass vase and acted as though he would throw it and did not respond to commands to put the vase down and get on the ground.  (Dkt. # 19-1, Ross Depo.).  After attempting to talk to Hyde, with no response, Ross fired his Taser gun and Hyde fell to the ground, then immediately got back up.  (Dkt. # 19).[2]  Hyde then threw the vase at Achberger, who had approached with the intention of handcuffing Hyde.  (Dkt. # 19-2, Horvath Depo.).  Hyde continued to pick things up from the cluttered basement and throw them at the officers.  (Dkt. # 19-2, Horvath Depo.; Dkt. # 19-3, Yurick Depo.; Dkt. # 19-4, Officer Daniel Murphy Depo.).  Hyde also began projectile vomitting at Hyde and Achberger.  (Ross Depo, p. 65).

Ross claims that pulled the trigger three more times, but the Taser gun was completely ineffective. (Ross Depo., Exh. A, p. 36).  Ross states he pulled the trigger on his Taser gun

---

[2]

   The term "taser" refers to an electronic device used to subdue violent or aggressive persons. It is classified as a firearm by the federal government. The Taser is a battery-charged unit approximately the size and appearance of a flashlight. It holds two cartridges, each containing a hooked barb, or dart, attached to the cartridge by a long, electricity-conducting wire. Each dart can be fired independently by depressing the corresponding lever located on the frame of the Taser. By continuing to press on the lever, a high voltage electrical current is transmitted through the wire to the target.

for a total of 10 or 11 times during this sequence, including the allegedly ineffective deployments. (Ross Depo., Exh. A, pp. 37, 39).  Horvath stated that after Ross's attempts to use his Taser with the first cartridge, Horvath deployed his Taser from 7-10 feet away from Hyde because he had a clear frontal shot. (Horvath Depo., Exh. B, p. 12).  Horvath approximates that he pulled the trigger on his Taser six times and two more in drive stun mode.[3]  (Horvath Depo., Exh. B, p. 14).  Yurick said he fired his Taser after Hyde started throwing objects, such as the air conditioner and other debris.  (Yurick Depo., Exh. C, p. 14). After this initial deployment of the Taser guns, the officers gave Hyde commands to stay down, relax, stop fighting.

Murphy then went looking for a fuse box in the basement with his flashlight and found it, covered in blood, with all the switches off. (Exh. D, Murphy Depo, p. 11; Exh. F, Fox Aff., Photo #12).  Murphy turned the power on and was able to restore the lights.  Hyde continued to resist the officers and was tasered again.  Ross removed his second cartridge and used the Taser as a drive stun, applying the gun directly to Hyde's skin, which enabled the other officers to handcuff Hyde.  Yurick and Horvath moved debris out of the way so that Murphy and Achberger could take Hyde into custody. (Exh. C, Yurick Depo., p. 27). Achberger got Hyde's right hand and cuffed it and Murphy grabbed his left arm to put Hyde on his stomach to cuff him.  However, Hyde continued to fight, kick his legs and roll side to side. (Exh. C, Yurick Depo, p. 27).

---

[3] The taser may also be deployed as a drive stun.  To do so, an officer may remove the probe cartridge from the gun and deploy the taser against the target individual's skin or clothing.

4

EMS moved in to treat the wound to Hyde's wrist, and the EMS technician claims that Hyde was still kicking and stating that he was going to kill the officers. (Exh. B, Horvath Depo, p. 20). At this time, the officers attempted to place Hyde in shackles because he continued to fight and kick. Horvath applied drive-stun to Hyde's left thigh and calf in order to gain control and accomplish the shackling. (Exh. B, Horvath Depo, pp. 20, 21). While the officers were placing the shackles on Hyde, Horvath used the drive stun function again to subdue him. (Dkt. # 19-2, Horvath Depo.; Dkt. # 19-3, Yurick Depo.). Horvath claims that he used the Taser's drive-stun function twice to shackle Hyde. The officers then noticed that Hyde was unconscious, and he was pronounced dead at the scene soon after. (Dkt. # 24). The coroner's report stated that

Plaintiff allege that Defendants excessively fired their Taser guns 25 times during the entire encounter. (Dkt. # 24). Defendant Horvath claims he used his Taser eight times, including the two times he used the drive-stun function when Hyde was being shackled. Yurick claims that he used his Taser five or six times. Ross claims he fired his Taser gun eleven times, including the allegedly unsuccessful deployments.

## II.    PROCEDURAL HISTORY

On January 4, 2007, Plaintiff filed a Complaint, naming as defendants officers Ross, Yurick, and Horvath. Plaintiff asserts claims under Ohio law for wrongful death, survivorship, and willful, wanton and reckless conduct. The Complaint also asserts a claim pursuant to 42 U.S.C. § 1983 for violation of Hyde's Fourth Amendment constitutional rights. The Defendants claim qualified immunity and move for summary judgment,

contending that contrary to the allegations in the Complaint, their use of the Taser gun was reasonable under the circumstances.

## III. STANDARD OF REVIEW

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56 (c). "Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering such a motion, the court must review all of the evidence in the record. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323 (quoting FED. R. CIV. P. 56 (c)).  The movant meets this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  Clayton v. Meijer, Inc., 281 F.3d 605, 609 (6th Cir. 2002) (quoting Celotex, 477 U.S. at 324-25).  The non-movant then "must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 250.

"The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 250).  "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  Anderson, 477 U.S. at 250.

## III.   LAW

The section 1983 claims in the case *sub judice* arise from the individual officers' alleged use of excessive force in violation of Hyde's Fourth Amendment rights, as secured by the Fourteenth Amendment.  Horvath, Yurick and Ross move for summary judgment, claiming qualified immunity.

When officials are sued in their individual capacities pursuant to section 1983, they may be protected from liability for damages if their alleged wrongful conduct was committed while they performed a function protected by qualified immunity.  See Cagle v. Gilley, 957

7

F.2d 1347, 1348 (6th Cir.1992).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  The privilege is an "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Id. Consequently, qualified immunity questions must be resolved at the earliest possible stage in litigation.  See Saucier v. Katz, 533 U.S. 194 (2001).

Government officials are generally entitled to qualified immunity when performing discretionary functions as long as the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1981).  In order to assert a violation of a "clearly established" right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  In other words, "in the light of pre-existing law the unlawfulness must be apparent."  Id.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

Consequently, the Court utilizes a three-step test in determining whether qualified immunity applies:  (1) whether, "based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred;" (2) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known;" and (3) "whether the plaintiff has offered sufficient

evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003); see also Barnes v. Wright, 449 F.3d 709 (6th Cir. 2006); Sample v. Bailey, 409 F.3d 689, 695 (6th Cir. 2005); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir. 2004). "If the answer to all three questions is 'yes,' qualified immunity is not proper." Id.

Furthermore, "[a]ll claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest . . . of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham, 490 U.S. at 395 (1989). "In making this evaluation, courts look at '(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." Id. As the Supreme Court stated in Graham:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments–in circumstances that are tense, uncertain, and rapidly evolving– about the amount of force that is necessary in a particular situation.

490 U.S. at 396-97.

## IV.   ANALYSIS.

The first step in any qualified immunity analysis is to determine whether the facts, viewed in the light most favorable to Plaintiffs, show that a constitutional violation could be found. See Feathers, 319 F.3d at 848 (6th Cir. 2003). This Court has held that individuals

9

have a right under the Fourth Amendment to be free of excessive force when police make an arrest or seizure.  See  Lyons v. City of Xenia, 417 F.3d 565, 575 (6th Cir.2005) (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)). It is also well-established that "[t]he Fourth Amendment [] prohibits unduly tight handcuffing in the course of an arrest." Lyons, 417 F.3d at 575 (citing Martin v. Heideman, 106 F.3d 1308, 1313 (6th Cir.1997); Walton v. City of Southfield, 995 F.2d 1331, 1342 (6th Cir.1993)).

Plaintiff argues that the officers' use of their Taser guns to incapacitate Hyde constituted excessive force.  Specifically, Plaintiff asserts that the use of the Taser guns after Hyde was handcuffed constitutes a gratuitous use of force in violation of Hyde's Fourth Amendment rights.  Although Plaintiffs do not separate their excessive force claim into two separate categories, it is apparent to the Court that Plaintiffs advance two separate excessive force claims: the initial use of the Taser guns and the use of the Taser guns after Hyde was handcuffed.  We address each claim in turn.

### A.      The initial use of the Taser

This Court finds one Sixth Circuit case addressing officers' use of a Taser gun.  Russo v. City of Cincinnati, 953 F. 2d 1036 (6th Cir. 1992).  In Russo, the Sixth Circuit held that an officer was entitled to qualified immunity despite using his Taser gun multiple times on knife-wielding suspect who was laying at the bottom of a stairwell and no longer an immediate threat.  Russo, 953 F. 2d at 1045.  The Court noted that the officer's "actions were intended to avoid having to resort to lethal force."  953 F.2d at 1044-45.  Specifically, the court found that, although the officer may have used excessive force during initial tasering,

10

plaintiffs had failed to show that clearly established law rendered the officer's actions unconstitutional in circumstances in which the officer confronted the suspect who was armed with knives, had made a number of threatening statements to the officers and was considered potentially homicidal and suicidal, and the officer was attempting to obviate need for lethal force.  Id.

The Court also finds the Eleventh's Circuit's opinion in Draper v. Reynolds, 369 F.3d 1270 (2004), particularly instructive in determining the reasonableness of the officers' use of the Taser gun under the circumstances of this case.  In Draper, officers stopped the plaintiff's truck for improper illumination of the vehicle's tag light.  369 F.3d at 1272.  The plaintiff immediately became belligerent with the officers, denied that he had done anything wrong, and ignored the officers' requests for documentation.  Id. at 1272-73.  After the plaintiff ignored the officers' multiple requests for documentation, one of the officers discharged his Taser gun at the plaintiff's chest.  Id. at 1273.  The plaintiff then sued the officers, alleging that the officers used excessive force in violation of federal and state law. Id. at 1274.

The Eleventh Circuit then concluded that the officer's use of the Taser gun to effectuate the plaintiff's arrest was reasonable under the circumstances.  Id.  The court found the following circumstances relevant in its evaluation of the plaintiff's claim: From the time Draper [the plaintiff] met Reynolds [the officer] . . .

> Draper was hostile, belligerent, and uncooperative. No less than five times, Reynolds asked Draper to retrieve documents from the truck cab, and each time Draper refused to comply. Rather, Draper accused Reynolds of

harassing him and blinding him with the flashlight. Draper used profanity, moved around and paced in agitation, and repeatedly yelled at Reynolds. <u>Id</u>. The court concluded that the officer's use of the taser gun "was reasonably proportionate to the difficult, tense and uncertain situation that [the officer] faced in this traffic stop, and did not constitute excessive force." <u>Id</u>.

In this Court's view, Hyde was more hostile, belligerent, and uncooperative than the plaintiffs in both <u>Russo</u> and <u>Draper</u>. Immediately upon the officers' entry into the basement, Hyde was found hiding behind the furnace. Although the officers identified themselves, Hyde refused to show his hands, claimed he had a gun, and threatened to kill the officers. Hyde repeatedly ignored the officers request to come out from behind the furnace with his hands up and threatened the officers with a glass vase. Even after he was tasered, Hyde threw objects at the officers. During the entire sequence, Hyde was covered in blood and projectile vomiting at the officers. Hyde continuously threatened that he would kill the officers, and the officers could not use their numbers to advantage due to the cramped and debris-filled basement. The Court, therefore, concludes that the officers initial use of the Taser, before Hyde was handcuffed, was a reasonable use of force under the circumstances.

The Court further notes that one of the main purposes of nonlethal, temporarily incapacitating devices such as the Taser to give police effective options short of lethal force that can be used to take custody of an armed suspect who refuses to be lawfully arrested or detained. <u>Ewolski v. City of Brunswick</u>, 287 F.3d 492, 508 (6th Cir. 2002). As a general matter, the Sixth Circuit has expressed doubt "that the use of non-lethal force against an armed and volatile suspect constitutes excessive force." <u>Id</u>. Hyde's case falls in this

category as the evidence is undisputed that he stated that he was armed with a gun and his aggressive behavior toward the officers by refusing to submit to arrest, projectile vomiting at the officers, threatening to kill the officers, and throwing heavy objects.

### B.    Subsequent use of the Taser

Plaintiff also claims that the officers' use of the Taser gun after Hyde was handcuffed constitutes gratuitous use of force in violation of the Fourth Amendment.  It is well established in the Sixth Circuit that the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional.  McDowell v. Rogers, 863 F.2d 1302, 1307 (6th Cir. 1988).  The Sixth Circuit has found that the use of nonlethal, temporarily incapacitating devices on a suspect who is already handcuffed and no longer poses a threat to the safety of the officers or others constitutes excessive force.  Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir. 2004), cert. denied, 161 L. Ed. 2d 725, 125 S. Ct. 1837 (2005).

Plaintiff cites Champion, along with other Sixth Circuit cases involving the use of pepper spray and chemical spray, for the proposition that tasing Hyde after he was handcuffed constitutes excessive force.  See Greene v. Barber, 310 F.3d 889, 898 (6th Cir. 2002) (holding that it may be excessive force to use pepper spray on suspect who was resisting arrest but "not threatening anyone's safety or attempting to evade arrest by flight"); Vaughn v. City of Lebanon, 18 Fed. Appx. 252, 2001 WL 966279, at * 12-13 (6th Cir. 2001) (holding that the use of a chemical spray may be unconstitutional when there is no immediate threat to the safety of the officers or others); Adams v. Metiva, 31 F.3d 375, 386 (6th Cir.

1994) (holding that the use of mace on a compliant suspect is constitutionally unreasonable). In Champion, the suspect was handcuffed on the ground, but continued to squirm and kick his feet in the air.  Champion, 380 F. 3d at 901.  Even after the officers attached a hobbling device to his ankles, they continued to use pepper spray on him.  The Court stated that it was constitutionally unreasonable for police officers to continue to spray a suspect, "who had stopped resisting arrest and posed no flight risk," and who "was immobilized by handcuffs and a hobbling device."  Id.

The Court finds that, contrary to Champion and similar case law prohibiting the use of force after a suspect has been subdued, Hyde still posed a threat to the officers after he was handcuffed.  When the officers attempted to handcuff one of Hyde's wrists, Hyde continued to fight, kick his legs and roll side to side.  Even after the officers handcuffed Hyde, he continued to violently kick his legs at the officers and EMTs treating his wrist injury.  The EMTs attempted to bandage a laceration on Hyde's arm that he sustained when breaking through the building.  Hyde, however, continued to kick and resist the EMTs' attempts to treat him and prevent further blood loss.  Horvath then used his Taser in drive-stun mode in order to gain control of Hyde's legs, but Hyde continued to kick and the drive stun appeared to have no effect.  (Horvath Depo., Exh. B, pp. 20-21). Finally, the officers were able to restrain Hyde's legs by the use of shackles.  In light of the fact that Hyde posed a danger to himself and the officers even after he was handcuffed, the Court finds the officers' use of the Taser reasonable under the circumstances.  Therefore, with the facts and all reasonable inferences are viewed in a light most favorable to the Plaintiff, the Court finds

that Plaintiff has failed to demonstrate a constitutional violation.

Even if Plaintiff could demonstrate a constitutional violation, Plaintiff fails to demonstrate the next step in the qualified immunity inquiry: whether the right which was violated was clearly established. The Supreme Court has stated that 'the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier v. Katz</u>, 533 U.S. 194, 202, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001). The constitutional right cannot simply be a general prohibition, but rather "the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). "In inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." <u>Walton v. City of Southfield</u>, 995 F.2d 1331, 1336 (6th Cir. 1993).

It has long been held in the Sixth Circuit that the right to be free from the use of excessive force under the Fourth Amendment is clearly established. <u>Adams</u>, 31 F.3d at 387. The Sixth Circuit has also held for more than twenty years that it is clearly established in this circuit that "a totally gratuitous blow" to a suspect who is handcuffed and offering no resistance violates the Fourth Amendment.  <u>McDowell</u>, 863 F.2d at 1307.  As discussed earlier, the  Sixth Circuit has addressed whether the officers' use of a Taser gun violated

clearly established law in <u>Russo</u>.  Although the court in Russo acknowledge that the use of a Taser may rise to the level of a constitutional violation, the plaintiffs failed to show that clearly established law rendered officer's actions unconstitutional in circumstances in which officer confronted suspect who was armed with knives, had made a number of threatening statements to officers and was considered potentially homicidal and suicidal, and officer was attempting to obviate need for lethal force.  <u>Id</u>.  <u>See</u> <u>also</u> <u>Devoe v. City of Eastpointe</u>, Case. No. 05-71863, 2006 U.S. Dist. Lexis 5326 (holding that an officers use of a taser in drive-stun mode in order to subdue a handcuffed suspect who refused to get into a police cruiser did not violated clearly established law).

The officers in the instant case were faced with similar circumstances.  Horvath, Ross, and Yurick used an intermediate degree of nonlethal force to subdue a suspect who was attempting to evade arrest, throwing heavy objects at the officers, showed signs of drug use or other impairment, and posed a clear risk of to the officers.  As the Sixth Circuit found held in <u>Russo</u>, the use of a Taser gun in these circumstances does not violated clearly established law.

## V.    CONCLUSION

Therefore, the Court concludes that the officers use of the Taser gun did not constitute excessive force in violation of the Fourth Amendment.[4]  Defendants are therefore entitled to

---

[4]

    As the Court has found that Plaintiff has not demonstrated a clearly established constitutional right or sufficient evidence to overcome summary judgment, the Court need not address the second step of the qualified immunity inquiry.  <u>See</u> <u>Champion,</u> 380 F.3d at 905.

qualified immunity.   Accordingly, Defendants' Motion for Summary Judgment is

**GRANTED.**   (Dkt. # 19).   Judgment is therefore **GRANTED** in favor of Defendants

Horvath, Yurick, and Ross and with respect to Plaintiffs' claims brought pursuant to 42

U.S.C. § 1983 arising from violations of Hyde's Fourth Amendment rights**.**

      **IT IS SO ORDERED.**

                    **/s/ *Peter C. Economus* – September 14, 2007**
                    **PETER C. ECONOMUS**
                    **UNITED STATES DISTRICT JUDGE**